IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARIUS RAMONE JAMES,

                    Petitioner,

          vs.

MIKE McDONALD, Warden, High Desert
State Prison,

                    Respondent.

No. 2:11-cv-02258-JKS

MEMORANDUM DECISION

          Darius Ramone James, a state prisoner appearing through counsel, filed a Petition for a

Writ of Habeas Corpus under 28 U.S.C. § 2254.  James is currently in the custody of the

California Department of Corrections incarcerated in the High Desert State Prison.  Respondent

has answered, and James has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

          James was convicted by a Sacramento County jury of forcible sodomy (Cal. Penal Code

§ 286(c)(2)), inflicting corporal injury on a spouse (Cal. Penal Code § 273.5), making a criminal

threat (Cal. Penal Code § 422), and resisting or delaying a peace officer (Cal. Penal Code

§ 148(a)(1)).  In a bifurcated trial, James was found to have a prior serious felony (Cal. Penal

Code §§ 667, 1170.12).  In December 2008 the Sacramento County Superior Court sentenced

James to an aggregate prison term of fourteen years four months.  The California Court of

Appeal, Third Appellate District, affirmed James's conviction and sentence in an unpublished

decision,[1] and the California Supreme Court denied review on September 22, 2010.  James

timely filed his Petition for relief in this Court on August 25, 2011.

The California Court of Appeal summarized the factual and procedural background:

> At trial, law enforcement officers testified to the victim's statements describing a physical and sexual assault by [James], but the victim herself testified and recanted her prior statements.  Evidence adduced at trial included the following: On May 5, 2008, [James], his pregnant wife, their infant daughter, and wife's five-year-old son, all of whom had been staying at the home of [James's] mother, stayed at a Motel 6.  In the morning, the victim went to the motel office with her children and called 911.  The transcript of the 911 call shows she reported:
>> "He threatened to choke me—
>> "911 OPERATOR:  Okay.  What's your name?
>> "[VICTIM]:  —kill me if I call the police."
> The victim reported, "first he hit me in my eye, and then he, um, and then he, um, um, hit me again.  And now it's just like I didn't even know I got—now I got a black eye, but he threatened that he's gonna kill me if I call the police officers and all this stuff."  She also said, "he hit me in my face last night, and he, um, he—and he al—he almost, um rape me in my (Unintelligible).  He did though.  I start [sic ] bleeding.  He started rape—started rape [sic ] me in my butt. (Unintelligible)."
> Responding sheriff's deputies detained [James] as he drove away from the motel and captured him when he ran.
> A deputy saw apparent blood in the motel room sink and discoloration to the victim's left eye.
> At the hospital, the victim told a deputy that, that night, the family went to buy marijuana.  On the drive back to the motel, the victim, who thought [James] might be bisexual, asked if [James] ever had sex with a man.  [James] got angry, struck the victim in the face, and said, "Watch when we get back to the motel."
> Back in the motel room, [James] told the boy to go into the bathroom, forcibly inserted his penis in the victim's "butt" and sodomized her against her will, despite her pleas for him to stop.  [James], at six feet, three inches in height and about 250 pounds, is almost a foot taller and 140 pounds heavier than the victim. He told her not to scream and, if she did, he would "stuff a wash rag" in her mouth.  She yelled anyway, because it hurt.  After he finished, [James] told her that if she reported the incident or told anyone about it, he would kill her.  He told her not to try to leave the room.  She was afraid. [James] sodomized her over a year earlier but promised never to do it again.  In the morning, [James] left, and the victim ran to the motel office and called 911.  She was grateful when the deputies arrived because [James] "probably would have killed" her.

---

[1] *People v. James*, No. C060741, 2010 WL 2473108 (Cal. Ct. App. June 17, 2010).

A physician's assistant, testifying as an expert in sexual assault examinations, testified he spoke with and examined the victim. She said [James] forced her to have anal sex, which caused her pain and anal bleeding. The physician's assistant observed the victim had bruised eyelids, a small amount of apparent blood on her underwear, and several small anal tears about two to four millimeters. There was no indication of hemorrhoids. The expert could not say whether any penetration was consensual.

Days after the attack, the victim applied for a restraining order but apparently let the matter drop. Her declaration under penalty of perjury attested that [James] injured her eyes and back and said, "He said he was going to kill me if I leave him." There was no specific reference to the sodomy. The victim also filed for legal separation but did not follow through.

A victim advocate from the District Attorney's office testified she met with the victim on June 4, 2008, to review her statement. The victim refused to confirm or deny her prior statement to police. She said [James] was controlling, and she wanted him to get "batterer's treatment," but she said she was not fearful and did not want him prosecuted.

At trial, the prosecution called the victim as a witness. The victim testified [James] did nothing wrong; her statements to the police were lies; and she contacted the District Attorney's office several times to say she lied. She lied to police because she was upset with [James] for taking the car and jealous because she believed he was seeing one of the other women with whom he had a baby. [James] never struck her and never sexually assaulted her. He does not have anger problems. She called 911 because he was taking her car, and she wanted it back. She had consensual vaginal intercourse with [James] that night. They did not have anal sex that night, and [James] never forcibly put his penis in her anus. All their sex was consensual. She did not remember any threats and was not in fear. She had hemorrhoids. She had no blood in her panties. When shown a photograph of her bruised face, she said her infant daughter accidentally hit her with a brush. The victim also denied any previous abuse. Her prior reports were lies she made up because she was angry and jealous. She loves her husband. She is not afraid of him, but she admitted she told the deputy that she was afraid of [James]. She admitted she asked the motel clerk to lock the office door while she called 911, but she claimed at trial the reason for the request was that she was afraid [James] would take her wedding ring, as he did in past fights.

Law enforcement officers testified to prior contacts with the victim. On April 29, 2005, she reported that [James] pushed her and struck her when she became jealous about a woman telephoning him. On December 24, 2006, she reported to law enforcement that [James] punched her four times in the head and once in the stomach, spread her "ass cheeks," spit on her anus and stuck his penis in her, after which she bled from her anus. He then raped her and sodomized her again. She wanted a restraining order but not a physical examination. The deputy observed redness and swelling around the victim's left eye. On January 10, 2008, she reported that [James] pushed her and her son out of a car, injuring her finger, and then drove

off.  The responding officer saw no visible injury to the finger.  The victim was upset that [James] had the car, because she needed it for errands.

Latoya Freeman, who bore [James] two sons but never married him, testified he gave her several black eyes and choked her twice during their relationship.  After their relationship ended, he stalked her, threatened her, and once displayed a handgun.

[James] did not testify.  The defense recalled the victim to the witness stand. She testified the red in the sink was not blood but juice from cherries she ate.  She had a bit of blood in her rectal area, but it was from hemorrhoids.  There was no nonconsensual anal sex.  What might have caused the anal tearing was that she had consensual anal sex with [James] a couple of days before their motel stay.

In the prosecution's rebuttal case, Angela Davis testified she and [James] were coworkers in October 1999, when he tried to kiss her while they were watching a movie at his house.  When she demurred, he set a gun on the coffee table and raped her and later took her home.[2]

## II.  GROUNDS RAISED/DEFENSES

James raises four grounds:  (1) that the trial court erred in failing to give a unanimity instruction on the charge of criminal threats *sua sponte*; (2) that the trial court erred in refusing to instruct that prior consensual sex could be considered on the issue of consent and the defense of reasonable and good faith belief as to consent; (3) that the the trial court erred in not granting a mistrial on the basis of non-responsive answers; and (4) that the trial court erred in instructing that prior acts need only be established by a preponderance of the evidence.  Respondent raises no affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based

---

[2] *Id.* at *1-3.

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[3]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[4]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[5]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[6]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[7]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[8]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

---

[3] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

[4] *Williams*, 529 U.S. at 412 (alteration added).

[5] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[6] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[7] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[8] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

the trial with unfairness as to make the resulting conviction a denial of due process.'"[9]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[10]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[11]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[12]

---

[9] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[10] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[11] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[12] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[13]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[14]  This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[15]

## IV.  DISCUSSION

Ground 1:  Instructional Error – Unanimity

James was convicted of uttering criminal threats.  James contends that the evidence suggested three separate, distinct threats at different times and places, including:  (1) the statement "watch when we get back to the motel"; (2) the threat to put a rag in her mouth during anal intercourse; and (3) the threat to kill the victim if she called the police.  James argues that, although such an instruction was not requested, the trial court erred in not *sua sponte* instructing the jury that they must unanimously agree on which act James committed that constituted a criminal threat.  The California Court of Appeal rejected James's argument.

---

[13] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[14] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[15] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[James] complains the trial court prejudicially erred in failing to instruct the jurors sua sponte that they must unanimously agree on which act constituted the criminal threat (§ 422) in count three. We see no grounds for reversal.

When the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. ( *People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  This unanimity requirement is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed. (*Ibid.*)  When a defendant is charged with a single count of making a criminal threat, and the evidence shows more than one criminal threat was made, the prosecution must either make an election of the threat for which a conviction is sought, or the trial court must give a jury unanimity instruction. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539.).

Count three alleged [James] made a threat to commit a crime which would result in "death and great bodily injury" to the victim.

[James] sees evidence of three separate threats:  (1) as they were driving, [James] said to the victim, "watch when we get back to the motel"; (2) during the anal intercourse, [James] told the victim not to scream or he would put a washrag in her mouth; and (3) after the anal intercourse, [James] told the victim not to call the police or tell anyone, or else he would kill her.

In the trial court, the prosecutor noted there was evidence of multiple threats and asked if the trial court felt a need to give the unanimity instruction for count three, the section 422 criminal threat.  The court stated it recalled multiple threats with regard to *uncharged* acts but did not recall multiple threats with regard to the charged offense.  The prosecutor said, "I think you're probably right, as I think about it."  The trial court asked if defense counsel had any comment, and defense counsel responded, "No comments, your Honor."  Defense counsel's mere concurrence in the trial court's decision does not constitute a deliberate, tactical choice that would rise to the level of invited error precluding review.  (*People v. Wader* (1993) 5 Cal.4th 610, 657-658; *People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8.)

The prosecutor in closing argument said the victim recanted because she wanted to get back together with her husband, and the jury should focus on what she said at the time of the crimes, which was more reliable because she was under the stress of the events, and the jury could hear the fear and terror in her voice during the 911 call.  The prosecutor spoke of [James's] statements:

"He threatened her at that moment [in the car when he hit her eye]. 'You just watch when we get back to that motel room.'  Just watch.  She told the deputy he definitely threatened her.

"[[James]] told [the boy], a little child in that little motel room, go inside the bathroom and shut the door, as if that's enough to protect a little child from hearing what's going on in that room.

"He forcibly sodomizes her.  She yelled, she screamed.  You heard Deputy Ball tell you what she said [the next day].  [[James]] told her keep it down or he's going to put a rag in her mouth.  She told him no multiple times, please don't.

"And she also mentioned, interestingly enough, that he had done this a year ago . . .. [W]e'll get into that, . . . that being referred to in restraining orders.

"He told her she better let him take control.  She better let him take control.

"Threatened to kill her.  She said she was afraid to Deputy Ball.  She's fearful of him.  You heard the 911 call.  He's threatening to kill me every day, she said on the 911 call.  You heard the fear, the comments about the threats.  You didn't hear anything about a wedding ring on that call, you heard about the threats and him threatening to kill her.  [A]nd she went to that motel office, she told you, the first chance she got.  First chance she got, when he left, she went to that motel office.  When she saw that patrol vehicle, when she saw law enforcement, she was thankful.  She was thankful, in fear that he was going to kill her."

In arguing the section 422 specifically, the prosecutor said:  "And then criminal threats.  There was a willful threat to kill or cause great bodily injury.  It was oral, and he intended that she understand that to be a threat.  It was clear and unconditional, communicated to her.  The seriousness and the immediate prospect caused her to be in fear.  And she told you—well, through the deputy, on that date the fear that she had.  And through the 911 call, you could still hear the fear that started the day before and continues up until the time she's on the phone in that motel office.  Was that fear reasonable?  Absolutely, given what occurred then, and her knowledge of his history and the abuse that she's had."

Thus, although the prosecutor mentioned death or great bodily injury as an element of section 422, her argument to the jury regarding section 422 focused on [James's] threat to kill the victim.  The specific threat to kill occurred after the sodomy, when [James] threatened to kill the victim if she told anyone.  The threat in the car ("watch when we get back") was a threat to commit the sexual assault.  The threat to put a washrag in the victim's mouth if she screamed was not a threat to kill.  Only the third threat was a threat to kill.

On appeal, [James] says the threat to put a washrag in the victim's mouth could be a threat to kill, because a washrag in the mouth could cause a person to choke, and perhaps when the victim said [James] threatened to choke her, she was referring to the washrag.  We disagree, and the prosecutor did not argue such theory to the jury.

*People v. Jantz* (2006) 137 Cal.App.4th 1283 held a unanimity instruction was not required for a section 422 criminal threats offense where the prosecutor made an election in closing argument.  Even though the prosecutor in that murder case talked about "threats" in the plural during closing argument, the specific argument about section 422 referred to a singular threat.  (*Id.* at p. 1292.)  Here too, the prosecutor adequately elected the threat to kill, and there was only one threat to kill.

Assuming for the sake of argument that the trial court should have given a unanimity instruction, any error was harmless.  Failure to give a unanimity instruction is governed by the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711], which requires the error to be harmless beyond a reasonable doubt.  (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853.)  Where the record provides no rational basis, by way of argument or

evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless. (*Ibid.*)  The failure to give a unanimity instruction is harmless where there is no reasonable possibility of a disagreement among the jurors regarding the specific acts that could support the charged offense. (*People v. Napoles* (2002) 104 Cal.App.4th 108, 119.)

In this case, [James's] threat to kill the victim was communicated in the victim's 911 call-the most credible and potent evidence in the case.  We see no basis on which the jury would not unanimously agree that [James] made this threat.

[James] argues the jury could have disagreed on which act or acts [James] committed for the section 422 offense.  However, [James] does not point to any possible disagreement as to whether he made one of the three statements but not the others.  He merely argues the jury may have disagreed as to whether each statement rose to the level of a section 422 threat.  He argues some jurors may have believed his statement in the car amounted to a section 422 threat, while other jurors may have felt the words lacked specifics as to what he would do.  [James] argues some jurors may have believed his warning about putting a washrag in the victim's mouth was a criminal threat because it risked suffocation, while other jurors may have concluded it was not a criminal threat because the victim would still be able to breathe through her nose.

[James's] arguments are not persuasive.  A unanimity instruction is required where there is evidence of more than one discrete crime. (*People v. Russo, supra,* 25 Cal.4th at p. 1132.)  If [James's] first two statements did not constitute crimes, the need for the instruction was not triggered.  Indeed, the People argue the instruction was not required because there was no evidence that either of the first two statements put the victim in the "sustained fear" required by section 422.

[James] also argues the jury obviously disbelieved the victim's recantation testimony but believed some of her testimony, e.g., that she and [James] were married or cohabiting, and therefore it cannot be concluded the jury necessarily found there was no disagreement [James] made each of the threats.  We disagree.  The recantation would not cause any disagreement as to whether [James] made one of the threatening statements but not the others.

We conclude the absence of a unanimity instruction does not warrant reversal of the judgment.[16]

James's argument flounders on two bases.  First, what acts fall within the purview of

Penal Code § 422 is strictly a question of California state law.[17]  The California Court of Appeal

---

[16] *James*, 2010 WL 2473108 at *10-13.

[17] *Cf. Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law.").

held that only one of the  alleged threats fell within the scope of § 422.  This Court is bound by

that determination.[18]  Second, as James candidly acknowledges, the Supreme Court has never

held that jury unanimity is constitutionally compelled in state criminal trials.[19]  Because the

Supreme Court has never so held, "it cannot be said that the state court 'unreasonabl[y] appli[ed]

clearly established Federal law.'"[20]  James is not entitled to relief under his first ground.

Ground 2:  Instructional Error – Prior Consensual Sex

The trial court declined to instruct the jury that prior consensual sexual intercourse could

be considered to determine either actual consent to sodomy or that James had a good faith belief

that the victim had consented to sodomy.  James contends that the failure to give such an

instruction denied him due process of law by lightening the prosecution's burden of proof.  The

California Court of Appeal disagreed:

A. *Background*
The trial court initially said it would grant [James's] request to instruct the
jury with CALCRIM No. 1194, that prior consensual sexual intercourse could be
considered on the issues of consent and mistaken belief about consent with respect

---

[18] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no
federal concern whether state law was correctly applied); *see Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and
application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the
state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*,
536 U.S. 584 (2002); *see also Isaac*, 456 U.S. at 119 (challenging the correctness of the
application of state law does not allege a deprivation of federal rights sufficient for habeas relief);
*Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court
failed to apply its own law).

[19] *Apodaca v. Oregon*, 406 U.S. 404, 406-14 (1972); *Johnson v. Louisiana*, 406 U.S. 356,
359 (1972); *see Schad v. Arizona*, 501 U.S. 624, 630 (1991) (declining the invitation to apply the
unanimity rule to state capital cases); *see also McDonald v. City of Chicago, Ill.*, 130 S. Ct. 3020,
3035 n.14 (2010) (noting that the Supreme Court has never held that a unanimous jury was
required in state criminal trials).

[20] *Musladin*, 549 U.S. at 77 (alterations by the Court).

to count one, forcible sodomy.  The court later stated it would modify the instruction to omit the language about reasonable/mistaken belief in consent, because no evidence supported that defense.  Later, during a break in the defense's closing argument, the court decided not to give the instruction at all, because it was inapplicable in that there was no evidence of consensual sodomy, i.e., the victim initially reported a forcible sodomy and later said there was no sodomy at all that night.  The court also noted defense counsel had made no reference in his closing argument to a consensual sodomy on the night in question, and defense counsel agreed he made no such reference.  Nor did defense counsel make any such reference in the remainder of his closing argument to the jury.

B.  *Analysis*

1.  *Actual Consent*

CALCRIM No. 1194 derives from section 1127d.[FN9]  Section 1127d was enacted as part of a legislative reform of sex offenses to counter the notion that an "unchaste woman" was more likely to have consented to sexual intercourse with the defendant.  (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 222 (Arabian, J., concurring.)  The jury instruction does nothing more than limit admissibility of evidence of the complainant's sexual history.

The parties argue whether section 1127d's omission of express reference to sodomy makes CALCRIM No. 1194 inapplicable to sodomy cases.  [James] argues in his reply brief that, even if the statute does not apply to sodomy, he was entitled to a pinpoint instruction along the lines of CALCRIM No. 1194, to pinpoint the defense theory of actual consent.

Regardless whether section 1127d applies to sodomy, "a criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case." (*People v. Gutierrez* (2002) 28 Cal.4th 1083.)

We observe, however, that actual consent was not a defense theory of the case—a point acknowledged by defense counsel's concurrence with the trial court's observation that defense counsel did not raise it in closing argument to the jury.

Assuming a jury instruction on actual consent would have been appropriate, the trial court erred in concluding it was unsupported by the evidence.  The trial court said there was no evidence of consensual sodomy because the victim initially reported a forcible sodomy and later said there was no sodomy at all.  However, there was evidence of sodomy (the victim's initial statements and the physical examination), and there was testimony from the victim that all of her sexual activity with [James] was consensual and that she engaged in consensual anal intercourse with [James] a couple of nights earlier.  Although her trial testimony denied having anal sex at all on the night in question, the jury could have disbelieved that portion of the testimony.  Thus, the jury could have found consensual sodomy occurred on the night in question.

Nevertheless, any error in failing to instruct on actual consent was harmless.

[James] argues absence of the instruction deprived him of a defense of consent, due process, or a liberty interest.  [James] cites inapposite authority that the California Supreme Court has not yet determined what test of prejudice applies to a

failure to instruct on an affirmative defense.  (*People v. (Anthony) Williams* (2009) 176 Cal.App.4th 1521, 1530, citing *People v. Salas* (2006) 37 Cal.4th 967, 984.)

Here, however, the defense did not argue to the jury an affirmative defense of consensual sodomy.  Moreover, omission of a pinpoint instruction is harmless where the instructions given adequately cover the point of the proposed instruction. (*People v. Gutierrez, supra,* 28 Cal.4th at p. 1144.)

Lack of consent was an element of the crime of forcible sodomy, and the trial court instructed the jury that in order for defendant to be found guilty of sodomy by force, the prosecution must prove that "[t]he other person did not consent to the act," and "[i]n order to *consent,* a person must act freely and voluntarily and know the nature of the act."  The court also instructed the jury that, in order to convict [James] of forcible sodomy, it had to find that [James] accomplished the act by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury," and "force" meant that [James] used enough physical force "to overcome the other person's will."

[James] argues the absence of the instruction (which would have told the jurors they could consider the prior consensual sexual activity only in deciding whether the victim consented) lightened the prosecution's burden because it permitted the jury to ignore the evidence of past consensual conduct.  We disagree.

We conclude any error in omitting CALCRIM No. 1194 or similar instruction regarding actual consent was harmless.

2.  *Mistaken Belief in Consent*

As to the portion of the proposed instruction about reasonable, good faith belief in consent, the trial court properly concluded no evidence supported that defense, and therefore the trial court did not err in refusing to instruct on it.

[James] argues the absence of the instruction deprived him of the defense, under *People v. Mayberry* (1975) 15 Cal.3d 143, that a reasonable yet mistaken belief the victim consented to the sex act was a defense.  However, a trial court must give a jury instruction on the *Mayberry* defense only when the defense is supported by substantial evidence sufficient to deserve consideration by the jury.  (*People v. (Wash Jones) Williams* (1992) 4 Cal.4th 354, 361.)  Such instruction "should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not."  (*Id.* at p. 362; accord, *People v. Dillon* (2009) 174 Cal.App.4th 1367, 1381-1383.)  *People v. Dominguez* (2006) 39 Cal.4th 1141, held the instruction was not required (sua sponte) where the defendant's evidence "did not indicate the kind of equivocal behavior [by the victim] from which a reasonable person could have concluded the victim had consented to have sexual intercourse when she in fact had not.  The most that could be said for [James's] testimony, if credited, is that the victim actually consented, not that he mistakenly believed she had done so."  (*Id.* at p. 1149.) *Dominguez* concluded the trial court did not err in failing to give the jury instruction. (*Ibid.*)

Usually, the defense of reasonable, good faith belief in consent is raised by a defendant's testimony about his beliefs and intentions, but the defendant's

testimony is not required.  (*People v. Simmons* (1989) 213 Cal.App.3d 573, 579 [noting a case where testimony of a percipient bystander sufficed to raise the defense].)  Although in some cases a defendant may succeed in raising the *Mayberry* defense without testifying, "the record must contain evidence, whether direct or circumstantial, of the defendant's state of mind at the time the offense was committed."  (*People v. Maury* (2003) 30 Cal.4th 342, 425.)

Here, there was no testimony from [James], nor was there any evidence of his subjective belief at the time of the charged offense.  Nor was there evidence of equivocal *behavior* by the victim that could support a finding that [James] reasonably but mistakenly believed she consented.  [James] argues the victim was equivocal, because she gave inconsistent statements about what happened.  However, while the victim was equivocal in her version of what happened, neither version included any equivocal behavior on her part.  She first said she was forced without her consent; she then said it did not happen at all.  As in *Dominguez, supra,* 39 Cal.4th at p. 1149, the most that could be said for the evidence from a defense perspective is that the victim actually consented, not that [James] mistakenly believed she had done so.

[James] argues that, because he went to buy marijuana that night, the jury may have found he believed the victim consented to sodomy because he was under the influence of marijuana.  However, there is no evidence of consumption or impairment and, even if there were, voluntary intoxication will not support a defense of reasonable, good faith belief that the victim consented to the sex act.  (*People v. Stanley* (1992) 6 Cal.App.4th 700, 706; *People v. Potter* (1978) 77 Cal.App.3d 45, 51.)

There was insufficient evidence to support an instruction on reasonable but mistaken belief in consent.[21]

The Supreme Court has held that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."[22]  The Ninth Circuit has applied that standard to habeas petitions arising out of state convictions.[23]  The Supreme Court has also held that it is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation,

---

[21] *James*, 2010 WL 2473108 at *13-16.

[22] *Mathews v. United States*, 485 U.S. 58, 63 (1988).

[23] *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002).

but must be viewed in the context of the overall charge."[24]  When evaluating whether a jury

charge denies a defendant the right to a fundamentally fair trial, the challenged jury instructions

must be viewed in the context of the entire charge on the specific subject.[25]  Where, as here, the

defect is the failure to give an instruction, the burden is even heavier because an omitted or

incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.[26]

"The inquiry is whether the trial court's refusal to give the [requested] instruction 'so infected the

entire trial that the resulting conviction violates due process.'"[27]

    In this case, after examining the jury instructions in their entirety, the California Court of

Appeal found that they adequately presented the question of whether the victim had actually

consented to being sodomized to the jury for consideration.[28]  This Court cannot say that the

California Court of Appeal's determination in this case was even incorrect or erroneous, let alone

an objectively unreasonable application of the principles of *Naughten-Kibbe*.[29]

    As to James's second point, an alleged defense that he had a good faith belief that the

victim had consented, his entire argument rests upon the proposition that the failure to give the

requested instruction was contrary to the decision of the California Supreme Court in *Mayberry*.

This argument also fails.  Reduced to its rudiments, this argument is essentially that the

---

[24] *Cupp v. Naughten,* 414 U.S. 141, 146-47 (1973).

[25] *Id.*

[26] *See Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

[27] *Jackson v. Edwards*, 404 F.3d 612, 624 (2d Cir. 2005) (quoting *Naughten*, 414 U.S. at 147).

[28] A defense that, as the Court of Appeal noted and James does not refute, James did not argue before the jury.

[29] *Wiggins*, 539 U.S. at 520-21.

15

California Court of Appeal misapplied California law, an argument that is not cognizable in this

proceeding.[30]  Even if this Court could reach the issue on the merits, it could not find that the

California Court of Appeal's application of *Mayberry* (the analogous state counterpart to

*Mathews*) was objectively unreasonable, not just incorrect or erroneous.  James is not entitled to

relief under his second ground.

Ground 3:  Mistrial – Non-responsive Answers

In testimony a witness volunteered that James had been previously incarcerated; the trial

court struck the testimony and directed the jury to disregard it.  Because one juror questioned

how the information could be disregarded, James contends that the trial court erred in denying

his motion for a mistrial.  The California Court of Appeal rejected James's argument:

> During testimony about uncharged misconduct, Latoya Freeman made various
> references to [James's] prior incarceration—without objection.  Thus, when asked
> how long she had known [James], Freeman answered, "We met our senior year of
> high school, and we broke up approximately one year before he got out of jail."
> When asked when the dating relationship ended, the witness said, "I believe he got
> out of jail in—" but was interrupted by counsel asking for "[j]ust the year," to which
> she responded she was not sure of the year.  Then, in response to a question as to
> when [James] stalked her, Freeman said, "Shortly after he got out of jail in April of
> 2004, [[James]] was very angry with me because I had moved on . . .."  The defense
> made no objection to any of this testimony.
>
> The defense did object when Freeman answered defense counsel's question
> during cross-examination as to whether the reason she went to family court was to
> cut off [James's] custody and visitation rights with the children. She responded, "No,
> it was not.  It was to make a custody arrangement whereby I would not have to be as
> involved with him and his mother by going to his house, or having to put myself in
> a position where I would be at risk. I never tried to take the kids from him.  I wanted
> him to see his kids.  I wanted him to be involved with his children because he had
> been absent from their life when he was incarcerated for three years and six months."
> Defense counsel objected.  After an unreported sidebar, the court instructed the jury:
>
> "THE COURT: All right. The last statement by the witness will be stricken,
> ladies and gentlemen.  You're to disregard that statement by the witness.  [¶]  There's

---

[30] *Cooke*, 131 S. Ct. at 863.

also been a reference by this witness to be [*sic* ] defendant being in jail.  You're to disregard that.  That statement is not relevant.  It's not evidence in this case.  You're to decide this case based solely on the admissible evidence in this case.  [¶]  Is there anyone who thinks they would have any difficulty disregarding the statement just made by this witness?  Anyone?  [¶]  If you think you'll have problems disregarding that statement, you need to tell me now.

"JUROR NUMBER 9:  How do you disregard it?

"THE COURT:  You don't consider it.  You pretend as if you've never heard that statement.  If you think that statement is going to influence you, I simply need to know that at this point in time.  It is not a relevant piece of information for this case.  You may not consider it, you may not utilize it, you may not rely upon it.  [¶]  Does anyone think they would have any difficulty following that order by the Court? [¶]  All right.  You [defense counsel] may proceed."

At the next recess, the trial court asked if counsel had any comment.  Defense counsel went on to a different subject.  The court returned to the issue.  Defense counsel moved for a mistrial.  The trial court denied the motion, stating, "I specifically went into probably more depth with the jury after the statement was made than one would normally do.  And the reason I did it was I wanted to ensure that, in fact, each of the jurors could set aside that statement.  One juror did say, 'How do we do that?'  And I did explain to the juror how they should do that.

"I went the next step and informed the jury that it is not admissible evidence. They have to disregard it.  They have to decide this case based solely on admissible evidence.  And then I asked then once again if anybody would have any trouble doing that.  All jurors essentially indicated they would be able to follow the Court's order and would be able to disregard the statement.

"I would also point out that although there was no in limine motion, it is something that I think all parties would normally agree it's prejudicial by its very nature, and should not be presented before a jury.

"I guess, [defense counsel], on one level, though, it was your question that elicited the information.  I know that it was not intentional, but I think one has to recognize that with regard to some of the witnesses who have testified in this case, there has been a tendency by those witnesses, specifically Ms. Freeman and [James's wife], to be less than responsive to every question that is asked, and to, in fact, answer a question that they did not hear but in which they wish to answer."

Defense counsel resumed cross-examination of Freeman, who said about a prior issue of her son's school enrollment that defendant was not present because "[h]e was incarcerated."  Defense counsel started to ask, "At the time that you're talking about, he was incarcerated, this was about the time—," but the record shows counsel and client conferred, and counsel then said he had no further questions.

B. *Analysis*

On appeal, [James] argues (1) the trial court erred in denying the mistrial motion, and (2) his trial attorney rendered ineffective assistance of counsel by failing to object to the other references about [James] being in jail.  We see no basis for reversal.

1. *Mistrial*

As to the mistrial motion, the People maintain [James's] appellate constitutional challenge (denial of his right to a fair and impartial jury) is forfeited for failure to raise it in the trial court.  [James] replies the constitutional challenge was implicit, and the record shows the trial court understood the concern whether the jurors could be fair after hearing the testimony.  Even assuming the matter is not forfeited, [James] fails to show grounds for reversal.

A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.)  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  (*Ibid.*)  On review, we apply the deferential abuse of discretion standard.  (*Ibid.*)

[James] argues the length of the incarceration was inherently prejudicial, particularly because it gave credence to the propensity evidence, which the jurors might otherwise have disbelieved due to witness bias.

However, the trial court immediately struck the reference to [James's] three and a half year incarceration and instructed the jury to disregard it.  We presume the jury will follow an instruction to disregard improper evidence.  (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404.)  It is only in the exceptional case that the improper subject matter is of such a character that its effect cannot be removed by the court's admonition.  (*Ibid.*)  That one juror asked how they could disregard it does not establish incurable prejudice.  We reject [James's] contention that the juror's question demonstrated the juror would have significant difficulty in disregarding the evidence.  We also reject [James's] contention that the trial court should have questioned that one juror individually.  The trial court was able to observe that juror's demeanor, as well as the demeanor of the other jurors, as the trial court explained the concept of disregarding stricken testimony.  The record reflects the trial court was satisfied all jurors could follow the instruction.

[James] argues the trial court's explanation—for the jurors to "pretend" they never heard the statement—was faulty because pretending and disregarding are two different things, and pretending leaves room for a juror to keep testimony in the back of his or her mind because he or she is "just pretending" it never happened.  We disagree and see no problem with the trial court's instructions to the jury.

[James] complains the court's instructions related only to one reference to incarceration, whereas there were several other references to incarceration.  However, there was no objection or mistrial motion with respect to the other references and therefore the matter cannot be raised on appeal.  (*People v. Wilson* (2008) 43 Cal.4th 1, 25.)

The trial court did not abuse its discretion in denying the mistrial motion.[31]

---

[31] *James*, 2010 WL 2473108 at *7-9.  The Court notes that James does not raise an ineffective assistance of counsel claim in the proceedings before this Court.

Here, the testimony was stricken and the jury was instructed to disregard the stricken testimony, an instruction the jury is presumed to have followed.[32]  As the Supreme Court has stated:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct., 1702, ----, 95 L.Ed.2d 176 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968).[33]

Reduced to its essence, James's argument is that implicit in the fact that the juror asked how one could disregard the evidence was that the juror had serious misgivings about his or her ability to disregard the evidence and that the trial court's use of "pretend" fell short of assuring that the juror would not consider the evidence.  This Court disagrees.  In addressing the subject, the trial court directed the jury to disregard the evidence four times, directed them not to consider it twice, and told them they could neither utilize nor rely on it.  In light of the entirety of the manner in which the trial court addressed the issue, it can hardly be said that there was an "'overwhelming probability' that the [juror would] be unable to follow the court's instructions," or "a strong likelihood that the effect of the evidence [was] devastating to [James]."[34] Accordingly, this Court cannot say the decision of the California Court of Appeal was objectively

---

[32] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis v. Franklin*, 471 U.S. 307, 323-24 & n.9 (1985) (discussing the subject in depth).

[33] *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).

[34] *Id.*

unreasonable, not just incorrect or erroneous.[35]  James is not entitled to relief under his third

ground.

### Ground 4:  Instructional Error – Prior Acts

The trial court instructed the jury with CALCRIM No. 1191 and CALCRIM No. 852

which provided that evidence of uncharged crimes could be considered in determining whether

James had the propensity to commit the crimes of sodomy and domestic violence if the jury

found that the uncharged crimes were proven by a preponderance of the evidence.  The

instructions further instructed the jury that, even if they found a propensity, this was but one of

the factors to be considered and propensity, standing alone, could not prove that James was

guilty; the prosecution must still prove the crimes of which he was charged beyond a reasonable

doubt.  Relying on the decision of the Ninth Circuit in *Gibson*,[36] James contends that in giving

these instructions his right to have guilt proven beyond a reasonable doubt was violated.  The

California Court of Appeal disagreed:

> [James] acknowledges case law rejecting constitutional challenges to the
> preponderance standard for propensity evidence.  (*People v. Reliford* (2003) 29
> Cal.4th 1007, 1012 [former CALJIC version]; *People v. Falsetta, supra,* 21 Cal.4th
> at p. 915.)  This court has held the current CALCRIM instructions do not differ
> materially from the CALJIC instructions approved by the California Supreme Court.
> (*People v. Reyes* (2008) 160 Cal.App.4th 246, 252-253; *People v. Cromp* (2007) 153
> Cal.App.4th 476, 480.)
>
> [James] argues that, notwithstanding these cases, his right to have his guilt
> proved beyond a reasonable doubt was violated in this case, because the victim

---

[35] *Wiggins*, 539 U.S. at 520-21.

[36] *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), *overruled in part by Hedgepeth v. Pulido*, 555 U.S. 57, 60 (2008), *as recognized in Byrd v. Lewis*, 566 F.3d 855, 866-67 (9th Cir. 2009).

recanted under oath.  [James] gives us no reason to revisit the issue, and we decline his request that we ask the California Supreme Court to revisit the issue.[37]

James reliance on *Gibson*, which involved the 1996 version of the challenged instructions, is misplaced.  The Ninth Circuit has since specifically held that the 1999 and 2002 revisions to the CALJIC instructions do not suffer the constitutional infirmity found to exist in *Gibson*.[38]  James is not entitled to relief under his fourth ground.

## V.  CONCLUSION AND ORDER

James is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[39]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[40]

The Clerk of the Court is to enter judgment accordingly.

Dated:  November 16, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[37] *James*, 2010 WL 2473108 at *6.

[38] *Schultz v. Tilton*, 689 F.3d 941, 943-44 (9th Cir. 2011).

[39] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[40] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.